IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                            Case No. 21-CR-383 RB

RICARDO ANTONIO NOVONDO-CEBALLOS,

      Defendant.

**REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT BECAUSE
8 U.S.C § 1326 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS***

Ricardo Antonio Novondo-Ceballos, by and through his attorney, Lynne McMullen, Assistant Federal Public Defender, respectfully submits this reply to the government's Response to Defendant's Motion to Dismiss Indictment. (Doc. 19.) Mr. Novondo-Ceballos moves to dismiss the indictment on the ground § 1326 is presumptively unconstitutional *under Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) as requested in Defendant's Motion to Dismiss Indictment Because 8 U.S.C. § 1326 Violates Equal Protection under *Arlington Heights*. (Doc. 17.)

**I.      INTRODUCTION**

In its response to Mr. Novondo-Ceballos's motion to dismiss the superseding indictment, the government never disputes that discrimination was a "motivating factor" in Congress's criminalization of illegal entry. *See Arlington Heights*, 429 U.S. at 265–66. Nor does it show that Congress would have passed the Undesirable Aliens Act of 1929 "even had the impermissible purpose not been considered." *Id.* at 270 n.21. Indeed, the government makes no attempt to condemn or the voluminous record of racist statements by legislative and executive officials

underlying the illegal entry law; rather, it argues that such sentiments are immaterial because the Congressional record fails to demonstrate racist remarks by each voting member.  A few of these racist statements which were that Congress wished to keep the "rat men" out of the American gene pool; "protect[] [the] American racial stock from further degradation or change through mongrelization"; avoid "poisoning the American citizen"; and keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."

Instead of grappling with this troubling history, the government claims that any racial intent motivating the criminalization of illegal entry is minimal and irrelevant, positing four basic arguments. Because none of these arguments is persuasive, the Court should find that § 1326 violates equal protection under Arlington Heights, or at least hold an evidentiary hearing to determine whether Congress would have passed the 1929 law without this discriminatory intent.

> 1. **Illegal entry is a criminal law not subject to the same rational-basis review as an immigration law.**

The government argues that the legal framework of *Arlington Heights* does not apply because § 1326 is an immigration law subject to deferential rational-basis review. (Doc. 19 at 5–8.) The government's general premise is that, no matter how odious, flagrant, or despicable the racism underlying a law, courts may not consider it because immigration laws passed by Congress are subject to weak or nonexistent judicial review.

Even assuming this disturbing approach is true for immigration laws, it is not true for laws that *criminalize* conduct. Over a century ago in *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), the Supreme Court held that Congress's plenary power in enacting the Chinese Exclusion Act did not authorize criminally prosecuting noncitizens for immigration-related crimes without granting them the same Fifth and Sixth Amendment rights afforded other defendants. It has applied the same rule ever since. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (recognizing that

2

"government detention violates [the Due Process Clause] unless the detention is ordered in a criminal proceeding with adequate procedural protections"); *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1042 (1984) (recognizing additional protections in the criminal context); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837–38 (1987) (same). Although decisions from other circuits are not binding on this court, it is worth noting that the Ninth Circuit recently confirmed that courts give no deference to "dual use" statutes that apply in both criminal and immigration proceedings—let alone statutes that are purely criminal. *See Valenzuela Gallardo v. Barr*, 968 F.3d 1053, 1059 (9th Cir. 2020).

    The government nevertheless relies heavily on *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998), to argue that illegal entry and reentry fall within the ambit of Congress's sweeping power over immigration matters. (Doc. 19 at 7.) *Hernandez-Guerrero* only repeats what *Wong Wing* said a hundred years ago—that Congress has the authority to criminalize illegal entry in the first place. *See Wong Wing*, 163 U.S. at 235; *Hernandez-Guerrero*, 147 F.3d at 1077 (explaining *Wong Wing's* ruling to that effect). This is a far cry from the government's theory—that Congress's plenary power over immigration may insulate a racially-motivated criminal law from an equal protection challenge. In fact, *Wong Wing* explicitly distinguished civil and criminal laws, noting that conduct "punishable by deprivation of liberty and property" under criminal law must be subject to constitutional guarantees afforded to criminal defendants. *Id.* at 237. *See also Plyler v. Doe*, 457 U.S. 202, 210 (1982) (recognizing that, despite the executive and legislative branch's "broad authority over both naturalization and foreign affairs," the Fifth Amendment protects unlawfully present individuals from "invidious discrimination by the Federal Government").

Put simply, where criminal penalties begin, weak judicial review over immigration legislation ends. As another example, the Supreme Court in *United States v. Mendoza-Lopez* acknowledged that neither the text nor the legislative history of the illegal reentry statute at 8 U.S.C. § 1326 required that a noncitizen's prior deportation order be lawful in order to convict. 481 U.S. 828, 834–37 (1987). Yet this did not "end [the] inquiry" because a statute that "impose[s] a criminal penalty for reentry after any deportation . . . does not comport with the constitutional requirement of due process." *Id.* at 837 (emphasis in original). *See also United States v. Barajas-Alvarado*, 655 F.3d 1077, 1087 (9th Cir. 2011) (following "exactly the approach" taken by *Mendoza-Lopez* to strike down a law prohibiting judicial review of an expedited removal order in a § 1326 proceeding). These cases confirm that even when Congress has tried to cut off constitutional protections for noncitizens in criminal proceedings, courts have refused to allow it to do so.

The government also claims that Congress's plenary power over immigration renders *Arlington Heights* inapplicable. (Doc. 19 at 8.) However, five Justices have agreed that the framework of *Arlington Heights* applies to the Deferred Action for Childhood Arrivals program known as "DACA." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915–16 (2020). While the DACA case involved an executive immigration decision, if both political branches have the same broad discretion over immigration, and the Supreme Court applies *Arlington Heights* to immigration rules from the executive, there is no reason it would not also apply to immigration laws passed by Congress.

The government disputes that *Arlington Heights* applies because rational basis review is the appropriate standard. The government misunderstands the type of equal protection challenge at play here. A lower standard of review may be appropriate for some classes of people where a

4

law discriminates on its face or authorities apply a neutral law in a discriminatory way. *See Loving v. Virginia*, 388 U.S. 1 (1967); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Where a decision-maker enacts a facially neutral law with a discriminatory purpose, that law violates equal protection if it continues to fulfill the original discriminatory enactors' purpose—regardless of the level of scrutiny. *See Arlington Heights*, 429 U.S. at 265–66. Indeed, the plurality in *Regents* applied *Arlington Heights* to an immigration decision with no mention of rational basis whatsoever. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. at 1915–16.

At a minimum, *Arlington Heights* "supplies the proper analysis" when "both impermissible racial motivation and racially discriminatory impact are demonstrated." *Hunter v. Underwood*, 471 U.S. 222, 232 (1985). Within the past several years, multiple district court judges have applied *Arlington Heights* to immigration provisions that raise racial discrimination claims. For instance, in *California v. U.S. Department of Homeland Security*, a district court judge applied *Arlington Heights* to a rule regarding whether an immigrant may become a "public charge," noting that the Supreme Court's decision in the *Regents* DACA case "indicates that application of the Arlington Heights framework is appropriate to evaluate whether plaintiffs plead discriminatory animus." 476 F. Supp. 3d 994, 1023 (N.D. Cal., 2020). The court further noted that *Arlington Heights* "did not address what level of scrutiny—*i.e.*, strict scrutiny, heightened scrutiny, or rational basis—a court should apply to an Equal Protection claim based on racial or ethnic discrimination." *Id.* But the court "would apply a strict scrutiny standard of review" if the plaintiffs "are able to demonstrate racial or ethnic discriminatory purpose to be a motivating factor of the Rule." *Id*. At least three other district courts have similarly applied *Arlington Heights* to claims of racial and national origin discrimination in the immigration context. The framework of *Arlington Heights* certainly applies to a claim of racial discrimination in a criminal case.

5

### 2. Six Supreme Court Justices have rejected the government's argument that Congress's intent "must be decided anew with each successive enactment."

In his motion, Mr. Novondo-Ceballos pointed out that two recent Supreme Court decisions held that reenacting a law passed with a discriminatory purpose does not cleanse the law of this purpose. First, the majority in *Ramos v. Louisiana* rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." 140 S. Ct. 1390, 1401 n.44 (2020). Then in *Espinoza v. Mont. Dep't of Revenue*, the majority relied on the law's "checkered tradition" of underlying religious discrimination to overturn it, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." 140 S. Ct. 2246, 2259 (2020). Concurring, Justice Alito noted that because "I lost, and *Ramos* is now precedent," the Court could examine the law's underlying motives even where legislators had "readopted their rules under different circumstances in later years." *Id.* at 2268 (quotations omitted).

The government brushes off these statements as irrelevant, again relying on the premise immigration laws are so unique as to render equal protection challenges to any other statues uninformative. (Doc. 19 at 14–15). To begin, these statements in *Ramos* and *Espinoza* are relevant, because the appropriate standard for analyzing an equal protection challenge to a federal law that after reenactment is a central question in Mr. Novondo-Ceballos's case. In the words of Justice Alito, who originally believed that discriminatory intent did not survive a law's reenactment, that approach is "now precedent." *Espinoza*, 140 S. Ct. at 2259. Here, six Justices either voiced support for considering a law's discriminatory origins following reenactment or recognized that position as the prevailing one. *See Ramos*, 140 S. Ct. at 1392–1420; *Espinoza*, 140 S. Ct. at 2268.  This

guidance to consider the discriminatory origins of a law is not limited to what level of scrutiny applies, or what subject matter the law covers.

This approach also makes sense. Perhaps if Congress had returned to the proverbial drawing board, grappled with the law's racist origins and effects, and decided it was nonetheless good policy, the government would have a point. Inexplicably, the government offers no reasoned justification why any amendment or reenactment—no matter how technical or stylistic—would neutralize all prior legislative history. Other circuits have addressed this issue, holding to the contrary: "[u]nder established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." *Redmond-Issaquah R.R. Pres. Ass'n v. Surface Transp. Bd.*, 223 F.3d 1057, 1062 (9th Cir. 2000) (quotations omitted).

The government has not shown that Congress meaningfully reevaluated the illegal entry statute in the lead-up to the 1952 reenactment or purged the racial animus of the original statute, because no such measured correction exists. The 1952 Act changed immigration law and policy in several ways, all without cleansing or even address the anti-Mexican sentiment underpinning the 1929 legislation. First, Congress repealed the complete exclusion of Asian immigrants from naturalization, although it maintained quotas for Asian immigrants. Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America*, 238 (2004). Second, the 1952 Act codified suspension of deportation for individuals who had been continually present in the country for seven years with spouses or children who were United States citizens. This modification benefited a large number of European immigrants, but very few people from Mexico, or other South or Central American countries: of the approximately 35,000 suspensions of deportation from 1941–1960, nearly three-quarters were of Europeans; only 8% involved

Mexicans. Ngai 82–88 & n.120, 239. With respect to the criminal entry and reentry provisions specifically, the 1952 Act made no substantive changes to ameliorate their original racist purpose. See Immigration and Nationality (McCarran-Walter) Act, ch. 477, § 276, 66 Stat. 229 (1952); see also Ingrid V. Eagly, *Prosecuting Immigration*, 104 Nw. U. L. Rev. 1281, 1326–1327 (2010) (*Prosecuting Immigration*); Doug Keller, *Re-Thinking Illegal Entry and Re-Entry*, 44 Loy. U. Chi. L.J. 65, 83 (2012). In fact, the 1952 Act's changes made unlawful entry and reentry easier to prosecute, thus exacerbating rather than diminishing their racially discriminatory harm. Perhaps the most obvious way that the 1952 Act expanded prosecution is the addition of a penalty for being "found in" the United States after having been deported (if the Attorney General has not granted permission to return). As the relevant committee report explained, "[t]his change [permits prosecution where] it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act." See *Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before the House and Senate Subcomms. of the Comms. On the Judiciary*, 82d Cong., 1st Sess. 716 (1951). In this context, the 1929 law's reenactment with only minor, stylistic changes to the offense definition strongly suggests that that law's purposes and effects endured. "Quite obviously, reenacting precisely the same language would be a strange way to make a change." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 484 (1997).

  **3.  Section 1326 bears more heavily on Mexican and Latinx people, which is all that is needed to show disparate impact.**

  Finally, illegal entry has disparately impacted Mexican and Latinx defendants. The government does not challenge Mr. Novondo-Ceballos's statistics showing that such defendants have made up the overwhelming majority of people convicted of § 1326. (Doc. 17 at 19–20.)

Instead, it argues that this disparate impact is a product of geography, not discrimination due to Mexico's proximity to the United States.

But this argument conflates the reasons behind a law with the law's results. The government does not dispute that § 1326's impact "'bears more heavily on one race than another.'" *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Under *Arlington Heights*, this is all that is required, since a law violates equal protection if its "original enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect." *Hunter*, 471 U.S. at 233.

In *Hunter*, for instance, the law's challengers showed that Alabama's provision originally "disfranchised approximately ten times as many blacks as whites." *Id.* at 227. The challengers also showed that "[t]his disparate effect persists today" because "blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement." *Id*. This was all that was necessary to show disparate impact. *See id*. at 227–33. The law's challengers did not have to show that white and black people committed the relevant disenfranchising misdemeanors at similar rates or disprove any other reason that the law disproportionately disenfranchised black people.

Here, Mr. Novondo-Ceballos easily clears this minimal disparate impact threshold. As his motion showed, in the years following the 1929 law's passage, Mexicans comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants. That outsize impact continues today: between 2000 and 2010, Mexicans constituted between 87% and 97% of persons apprehended at the border. So it is irrelevant whether § 1326's present disparate impact is a product of "geography" or "discrimination." All that matters is that it does impact Mexican and Latinx communities.

9

Furthermore, almost every claim of disparate impact under *Arlington Heights* could be characterized as a "product of geography." For instance, the Ninth Circuit has held that planning decisions made with a racist purpose in predominantly or trending Latinx neighborhoods have disparate impacts on Latinx people. *See The Comm. Concerning Commun. Improvement v. City of Modesto*, 583 F.3d 690, 704–06 (9th Cir. 2009). Educational decisions made with a racist purpose in a predominantly Latinx city have a disparate impact on Latinx students. *See Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015). Voting decisions made with a racist purpose in a state where some American Indian, Latinx, and Black neighborhoods have limited transit and mail access have a disparate impact on those communities. *See D.N.C. v. Hobbs*, 948 F.3d 989, 1004–06 (9th Cir. 2020) (en banc). Likewise, the Tenth Circuit has held that funding decisions that impacted only a Native American reservation community have a disparate impact on Native American people. *See Navajo Nation* v. *State of N.M.* 975 F.2d 741. 743 (1992). If the government's "geography not discrimination" theory were correct, these plaintiffs could never have shown a disparate impact, yet courts held in all these cases that they could.

The absence of quotas for Mexicans and individuals from other South and Central American countries was an error of omission, rather than proof of legislators' lack of discriminatory intent. Indeed, the crime of illegal entry was brokered as a compromise between agricultural growers and nativists in Congress, allowing Congress's racial goals to be fulfilled while avoiding economic harm to growers. At a minimum, if the government wishes to mount a meaningful claim that § 1326 was not fueled by a discriminatory purpose, the place to do so is in an evidentiary hearing.

## II.     CONCLUSION

In its response to Mr. Novondo-Ceballos's motion to dismiss the superseding indictment, the government fails to show that discrimination was not a "motivating factor" in Congress's

10

criminalization of illegal entry. It is hard to imagine a legislative record more laden with evidence of racism, and a crime with a greater impact on one racial group, than illegal entry. Because the government comes nowhere close to showing that Congress would have enacted illegal entry in 1929 in the absence of a discriminatory motive, as *Arlington Heights* requires, this Court should dismiss the superseding indictment. If the Court is inclined to weigh the matter further before rendering a final decision, it should schedule an evidentiary hearing.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
506 S. Main Street, Suite 400
Las Cruces, New Mexico 88001
(575) 527-6930
lynne_mcmullen@fd.org

***Electronically filed on May 11, 2021.***

*/s/ Lynne McMullen*
LYNNE MCMULLEN
Assistant Federal Public Defender